# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# EASTERN DIVISION

**FIRST SPECIALTY INSURANCE CORPORATION**             **PETITIONER**

**VS.**             **CAUSE NO.: 1:07CV98-SA**

**UNITED STATES AQUACULTURE LICENSING, et al.**        **RESPONDENTS**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Findings of Fact*

Mississippi State University ("MSU") developed and bred a new strain of catfish referred to as either "USDA 103" or "NWAC 103." United States Aquaculture Licensing ("USAL") contracted with MSU to market the NWAC 103 catfish through a licensing agreement. In that contract, MSU required that USAL would provide insurance coverage and list MSU as an additional insured.

During March and April 2003, USAL contacted Bill Andrews Insurance Agency to procure insurance. After speaking with a few insurance companies, Andrews contacted Insurisk Excess & Surplus Lines ("Insurisk"), First Specialty Insurance Corporation's agent ("First Specialty" or "Petitioner"). Through Insurisk, First Specialty ultimately issued a commercial general liability policy to USAL, effective April 25, 2003, to April 25, 2004, ("2003 Policy") and the following year, another policy effective from April 28, 2004, to April 28, 2005, ("2004 Policy").

From February 20, 2001, to March 3, 2002, Bear Creek Fisheries, Inc. ("Bear Creek") purchased NWAC 103 catfish from MSU. Thereafter, approximately ninety-six percent of the catfish fry and small fingerlings in Bear Creek's production ponds perished, including the offspring fry and fingerlings of the catfish sold. Thus, Bear Creek filed a state court action

against MSU titled Bear Creek Fisheries, Inc. v. Mississippi Board of Trustees of State Institution of Higher Learning, Case No. CI2005-253, in the Circuit Court of Washington County, Mississippi, ("the underlying action"), alleging breach of contract, negligence, and breach of express and implied warranties.

Upon receipt of the complaint, MSU contacted USAL and requested that First Specialty defend the underlying action. Subsequently, First Specialty filed a Petition for Declaratory Relief asking this Court declare that it has no duty to defend or indemnify USAL or MSU as to any verdicts, judgments, damages, or settlements in connection with the underlying action.

The parties have stipulated the following:

The 2004 Policy contained a Classification Limitation Endorsement and Designated Premises Endorsement. The 2003 Policy contained a Classification Limitation Endorsement, but not a Designated Premises Endorsement.

If coverage is found to exist as to USAL to the claims asserted by Bear Creek in the underlying action, MSU is entitled to coverage only to the same extent as USAL's coverage.

The death of the NWAC 103 catfish was an accidental "occurrence" under the Policy.

The death of the NWAC 103 catfish constitutes "physical injury to tangible property" and therefore meets the policy definition of "property damage."

Although the NWAC 103 catfish sold to Bear Creek constitute USAL's and MSU's "product," the fingerlings of those NWAC 103 catfish do not constitute USAL's or MSU's "product" under the Policy.

The damage to the NWAC 103 catfish occurred either at Bear Creek's production ponds or at MSU at Stoneville. The death of the NWAC 103 catfish did not occur at USAL's premises. The NWAC 103 catfish were never handled by USAL and were never upon USAL's premises.

The Respondents insist that the Classification Endorsement is invalid because it contained the language "Lessors' Risk Only" when Respondent USAL was never a lessor.[1]

---

[1] USAL's 2003 application indicated it was a "tenant." However, USAL's 2004 application noted that it was an "owner."

Petitioner does not dispute that USAL was never a lessor. Alternatively, the Respondents maintain that, at the least, the classification limitation is ambiguous. Respondents argue that since the policy covers operations, the policy should cover the death of the fish. Also, the Respondents aver that the policy declarations (to which the classification limitation refers) identify USAL as a "Licensing Conduit" in the description which would be applicable to all of the endorsements and limitations in the policy. Furthermore, Respondents assert that the Standard Industrial Classification ("SIC") code assigned to the policy also incorrectly indicated that USAL was a lessor. In sum, the Respondents conclude that these discrepancies in the classification limitation and declarations should warrant the entire policy ambiguous.

Additionally, Respondents contend the Designated Premises Endorsement does not bar coverage because it is an invalid endorsement since First Specialty unilaterally without notice or consideration changed the 2004 renewal policy to add the Designated Premises Endorsement. Nevertheless, the Respondents avow that if the endorsement is valid, the licensing agreement between USAL and MSU includes growing fish, and First Specialty and Insurisk should have understood the risk.[2] In sum, the Respondents urge that these discrepancies render the whole policy ambiguous and, therefore, should be construed by the Court in favor of coverage.

First Specialty asks the Court to find that the policy in effect is unambiguous and a premises-only policy since the policy contains a classification and designation endorsement citing only to the building or premises listed at 1100 Hwy East, Indianola, MS 38751.

---

[2] The Respondents declare that the Petitioner should have evaluated the licensing agreement between MSU and USAL in order to add MSU as an additional insured. It is undisputed that neither First Specialty nor Insurisk were privy to the licensing agreement. Neither party has cited, nor has the Court found, any case law requiring the insurer to evaluate side agreements with third parties or additional insureds. Also, under the "PRODUCTS/COMPLETED OPERATIONS" section of USAL's application for insurance, USAL stated that it had no guarantees, warranties, or hold harmless agreements.

3

Furthermore, First Specialty asserts that since the declaration states that the policy premium is based on square feet, this evidences that the policy was a premises-only policy.

In addition, Petitioner avers that the designation premises endorsement does not materially change the policy since the 2003 policy is indeed a premises liability policy. Also, Petitioner contends that although there is a discrepancy in the numerical SIC code and the classification limitation, it is at the fault of USAL and/or Andrews since USAL referred to itself as an "owner" in the 2004 Application. Regardless, Petitioner insists that the discrepancies in the SIC code are immaterial since the policy is nonetheless a premises-only policy. Lastly, Petitioner asserts that Andrews was USAL's agent, not Insurisk's or First Specialty's. In sum, Petitioner concludes it has no duty to defend the underlying action against MSU.

The Court held a non-jury trial on August 4th and 5th, 2008. At trial, Petitioner offered as witnesses Bill Andrews, the broker/selling agent; Steve Hoffman, Insurisk's representative; and Kevin Riedel, First Specialty's representative. Respondents did not rebut or proffer with any witnesses. After hearing testimony and evaluating the post-trial briefs, the Court is prepared to rule.

*Conclusions of Law*

The Court and the parties are in agreement that Mississippi law shall govern.[3] Mississippi law holds that an insurance policy is a contract subject to the general rules of contract interpretation. Clark v. State Farm Mut. Auto. Ins. Co., 725 So. 2d 779, 781 (Miss. 1998). Under well-settled Mississippi law, the aim of contract interpretation is to determine the common intent of the parties.

---

[3] Pursuant to Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), the substantive law that shall govern is the law of the forum in which the federal court sits, which in the case sub judice is the State of Mississippi.

"A duty to defend arises when potential for coverage exists." Titan Indem. Co. v. Pope, 976 So. 2d 1096, 1100 (Miss. Ct. App. 2004). An insurer's duty to defend an action against its insured is measured by the allegations in the plaintiff's pleadings in the underlying action. Id. The Court gauges the allegedly tortious underlying conduct and compares it with the words of the policy. Ingalls Shipbuilding v. Fed. Ins. Co., 410 F.3d 214, 225 (5th Cir. 2005); Am. Guar. & Liab. Ins. Co. v. 1906 Co., 273 F.3d 605, 610 (5th Cir. 2001); Farmland Mut. Ins. Co. v. Scruggs, 886 So. 2d 714, 719 (Miss. 2004). In sum, a duty to defend arises if the "complaint alleges facts which are arguably within the policy's coverage." Acceptance Ins. Co. v. Powe Timber Co., Inc., 403 F. Supp. 2d 552, 554 (S.D. Miss. 2005). "The mere fact that the parties disagree about the meaning of a contract does not make the contract ambiguous as a matter of law." Turner v. Terry, 799 So. 2d 25, 32 (Miss. 2001); Cherry v. Anthony, 501 So. 2d 416, 419 (Miss. 1987).

In order to determine the true intent of the parties, the court shall look to the "objective language of the contract." One South Inc. v. Hollowell, 963 So. 2d 1156, 1162 (Miss. 2007). Courts have implemented the "four corners" test to evaluate the language that the parties used in their agreement. Id. The court will first analyze what the parties stated "since the words employed are by far the best resource for ascertaining the intent and assigning with fairness and accuracy." Id.

Next, if the court cannot determine the parties' intent after assessing the language of the contract, it will "apply the discretionary 'canons' of contract construction," which includes interpreting ambiguous provisions against the drafter. Id.; see also Goldberg v. Lowe, 509 F. Supp. 412, 421 (N.D. Miss. 1981) (stating that extrinsic evidence will only be considered when

5

the written contract is ambiguous or indefinite). If the contract remains unclear, the court should then consider extrinsic or parol evidence." One South, Inc., 963 So. 2d at 1162-63.

## DISCUSSION

After hearing the Petitioner's testimony at trial and evaluating the respective briefs, the Court is of the opinion that neither the 2003 nor 2004 policy is ambiguous. Both policies provide premises-only coverage. Additionally, the Court opines that the 2004 policy was in effect at time the underlying action arose.

### Both policies contain premises-only coverage.

The 2004 Policy Classification Endorsement reads:

> In consideration of the premium charged, it is hereby understood and agreed that coverage under the policy is specifically limited to, and applies only to those operations as described under the description of hazards section of the applicable coverage part or schedule designated in the Declarations page of this policy. **The policy excludes coverage for any operation not specifically listed in the coverage part, schedule or Declarations page of this policy.** (emphasis added).

Moreover, the Commercial General Liability Coverage Schedule reads:

> Classification
>
> **"BUILDINGS OR PREMISES** – BANK OR OFFICE – MERCANTILE OR MANUFACTURING (LESSOR'S RISK ONLY) – OTHER THAN NOT-FOR-PROFIT (PRODUCTS – COMPLETED OPERATIONS ARE SUBJECT TO THE GENERAL AGGREGATE LIMIT)" (emphasis added).

The Designated Premises Endorsement states:

> This endorsement **modifies** insurance provided under the following:
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> SCHEDULE
> Premises:
> 1100 HWY 82 EAST, INDIANOLA, MS 38751 (emphasis added)
> . . .
> (If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)


>This insurance applies only to "bodily injury", "property damage", "personal and advertising injury" and medical expenses arising out of:
>1. The ownership, maintenance or **use of the premises shown in the Schedule and operations necessary or incidental to those premises**; or
>2. The project shown in the schedule. (emphasis added).

As evidenced above, the 2004 policy clearly limits the coverage to premises only. The Respondents argue that adding these endorsements restricted or reduced coverage thus necessitating notice and/or additional consideration. To determine whether the 2004 policy reduced the scope of coverage, the Court must analyze the 2003 policy to determine what it covered.

In the 2003 Policy, the Classification Limitation Endorsement is identical. The 2003 policy's classification limitation limits coverage to:

> "**Buildings or Premises** – bank or office – mercantile or manufacturing (lessors' risk only) – Other than Not-for-Profit." (emphasis added)

Moreover, the Commercial Property Coverage Part Declarations page states:
> . . .
> "**DESCRIPTION OF PREMISES**:
> (Location, Construction and Occupancy) 1100 HWY 82E. INDIANOLA, MS 38751 – JOISTED MASONRY – US AQUACULTRAL [sic]" (emphasis added)
>
> "COVERAGES PROVIDED: Insurance at the **described premises** applies only for coverage for which a limit of insurance is shown. (emphasis added)

As evidenced above, this policy is also a premises-only policy. Coverage was limited to "Buildings or Premises," and no mention of off-premises product coverage is present in the Classification Limitation or the Declarations. Also, the policy premium is based on square feet, which implies the policy is a premises-only policy.

The Respondents aver that the naming of USAL as an owner or lessor instead of correctly as a tenant and using the wrong numerical SIC code create an ambiguity. This Court is not persuaded by this assertion. The policy here is not ambiguous and not susceptible to two

7

reasonable interpretations, and therefore must be interpreted and enforced as written. Ins. Co. of North Am. v. Deposit Guar. Nat. Bank, 258 So. 2d 798, 801 (Miss. 1972); Gulf Guar. Life Ins. Co. v. Thompson, 363 So. 2d 297, 298 (Miss. 1978). It is unreasonable to assert that classifying USAL as a lessor together with the policy having an incorrect numerical SIC code create ambiguity in coverage under the entire policy, i.e., these discrepancies do not address the scope of the coverage. In sum, the policy merely naming USAL as a lessor instead of correctly as a tenant and, further, containing a numerical SIC code associated with a lessor does not create an ambiguity with respect to coverage.[4]

As noted above, Respondents argue that since the policy covers operations, the policy should cover the death of the fish. The Court holds that the operations covered in the policy are limited to the operations located on the premises for reasons noted above, i.e., the policies are premises-only. See Colony Nat. Ins. Co. v. Hing Wah Chinese Rest., 546 F. Supp. 2d 202, 209 (E.D. Pa. 2008)(The Court held that the word "restaurant" is unambiguous and does not encompass a vehicle accident that occurred off-premises associated with the restaurant's food delivery business. Also, "because not all restaurants deliver food, it logically follows that food delivery is not an inherent part of operating a restaurant.").

Respondents also aver that since the declaration states that USAL is a licensing conduit, the policy should cover the death of the fish. The Court is unable to make this leap. A licensing conduit issues licenses or documents and not products. Furthermore, the word "licensing conduit" is not synonymous with catfish grower. In addition, because not all licensing conduits issue licenses that cover a unique strain of catfish, it logically follows that growing catfish is not

---

[4] In fact, as noted supra, USAL identified itself as an "owner" in the 2004 policy. Also, the un-rebutted testimony of Kevin Reidel of First Specialty was that SIC codes are governmental or regulatory codes that have nothing to do with coverage. Further, no testimony exists that either USAL or Andrews knew what the code meant or that they relied on it for any purpose.

8

an inherent part of operating a licensing conduit. Thus, the description of "licensing conduit" does not create coverage for the death of the catfish.

As mentioned supra regarding the evaluation of an ambiguity, the Court gauges the allegedly tortious underlying conduct and compares it with the words of the policy. Ingalls Shipbuilding, 410 F.3d at 225; 1906 Co., 273 F.3d at 610; Scruggs, 886 So. 2d at 719. The underlying conduct in this case arises out of the death of catfish (that occurred on an off-premises site).

After diligently evaluating the policy, the Court can find no language in the policy that would include the death or perish of a "product" occurring on a third party's property. The classification endorsement limits coverage to "Building or Premises."

"Generally, under Mississippi law, when the words of an insurance policy are plain and unambiguous, the court will afford them their plain, ordinary meaning and will apply them as written." Anglin v. Gulf Guar. Life Ins. Co., 956 So. 2d 853, 859 (Miss. 2007) (quoting Noxubee County Sch. Dist. v. United Nat'l Ins. Co., 883 So. 2d 1159, 1166 (Miss. 2004)). Thus, the Court concludes the 2003 policy is a premises-only policy which limits liability to occurrences that happen at the address listed in the policy under "Description of Premises." Importantly, off-premises products are not covered under the policy. In sum, the 2003 policy is a premises-only policy limited to the building listed in the "Description of Premises."

**Since both policies contain premises-only coverage, the addition of the designated premises endorsement in 2004 did not restrict or reduce coverage.**

Therefore, in 2004, when the "Designated Premises Endorsement," which states, "the insurance applies only to 'bodily injury', 'property damage', 'personal and advertising injury' and medical expenses arising out of: (5) [t]he ownership, maintenance or use of the premises shown in the Schedule and operations necessary or incidental to those premises; or (6) [t]he

9

project shown in the schedule," was added to the policy, the endorsement did not reduce or further restrict coverage since the policy was already limited to the premises listed at the address provided in the 2003 policy.

**Even if the designated premises endorsement is a reduction in coverage, the outcome is the same.**

Alternatively, even if the Court found the designated premises endorsement to be a reduction in coverage, USAL's agent[5], Andrews, received notice of the new policy and forwarded the policy to the insured, USAL. Andrews was USAL's agent for the purposes of procurement, and he is the same agent for purposes of receipt of policy and terms. Also, "the insured has an affirmative duty to read the policy." Leonard v. Nationwide Mut. Ins. Co., 499 F.3d 419, 438 (5th Cir. 2007). "Whether the policy was read or not, however, constructive knowledge of its contents is imputed to the policyholder." Id. Here, the insured's agent read the policy and mailed it to the insured for review. As such, the notice requirement is satisfied.[6]

As to the Respondents' reliance on the Mississippi Supreme Court's ruling regarding consideration in Krebs v. Strange, the Court finds that the case before this Court is distinguishable. 419 So. 2d 178 (Miss. 1982). In Krebs, the insured had a policy which was effective from September 7, 1972, to September 7, 1973. Id. at 180. In December of 1972, the agent advised the insured that his coverage would be terminated or not renewed on its anniversary date (September 7, 1973) if he failed to sign and accept the 'student exclusion' endorsement. Id. at 180-81. Specifically, the modification read,

> If you don't agree to this modification, then upon the termination of the present insurance contract we will not make an offer to renew the insurance policy. On the other hand, if

---

[5] See "Agency Issues" section discussed infra.
[6] Although not cited by either party, the Court's search revealed persuasive authority in the case of Great Am. Ins. Co. v. Lowry Dev., LLC, 524 F. Supp. 2d 778 (S. D. Miss. 2007). However, the case before the Court is distinguishable from Lowry. In the case sub judice, the insured received notice of the new policy, whereas in Lowry, the insured did not.

10

> you agree to this modification, then we may or we may not make an offer to renew this insurance policy.

Id. at 182. Therefore, the insured signed the endorsement. Id. The policy was renewed with a new effective date of September 7, 1973, to September 7, 1974. Id. at 180.

An accident occurred on September 29, 1973, and the driver of the car, the insured's daughter, was a student. Id. The Court held the insurer's forbearance to cancel the new policy was an illusory promise and not valid consideration because the insurer had the option **to renew or not in the future**. Id. at 182.

Notably, the Court continued,

> Although the modification adding the "student exclusion" endorsement was void at the time of its signing by Mr. McLeod, one may ask whether, upon the subsequent renewal of the insurance policy on September 7, 1973, for new consideration, the endorsement was included as one of the terms of the new contract. This proposition was not specifically included in the questions certified to this Court. . .

Id. at 183.

Accordingly, this case is distinguishable from Krebs. The new policy in the case sub judice was a new contract. The policy contains an endorsement that "was included as one of the terms of the new contract." Therefore, this constituted new consideration and no illusory promise existed. As such, the Court finds the 2004 policy was a new contract and in effect at the time the underlying action arose. In sum, the result, that the designated premises endorsement was valid and in effect, remains unchanged.

**With or without the designated premises endorsement, the 2004 (and the 2003) policies unambiguously contain premises-only coverage.**

Regardless of whether the addition of the designated premises endorsement was a reduction in coverage, the outcome is the same because the 2003 policy and the 2004 policy with or without the endorsements are both unambiguously premises-only policy as discussed supra.

**Having heard testimony of the parties' intent, the outcome remains the same.**

The Respondents had an adequate opportunity at trial to persuade the court of its intent to receive a products liability policy.[7] Notably, the Respondents did not proffer a single witness. Thus, the Court can only evaluate USAL's applications for insurance and Insurisk's return quote. USAL's 2003 and 2004 applications only requested a commercial general liability policy limited to the premises. In fact, in the 2003 and 2004 applications' "SCHEDULE OF HAZARDS" section, the "CLASSIFICATION" reads, "BLGS – PREMISES – OFFICE" in the 2003 policy and "BLGS – PREMISES – LRO[8]" in the 2004 policy. Furthermore, under the "PRODUCTS/COMPLETED OPERATIONS" section, when asked "DOES APPLICANT INSTALL, SERVICE, OR DEMONSTRATE PRODUCTS?" USAL checked the "NO" column. Importantly, every question inquiring about products in both applications is answered in the negative. In addition, the quote Insurisk submitted stated it was for "premises liability-LRO." Thus, the Court concludes that USAL requested a premises-only policy, and the Petitioner and Insurisk intended to issue a premises-only policy.

**Agency Issues**

The parties disagree whether Bill Andrews is an agent for USAL, Insurisk, or First Specialty. At the outset, the Court notes that neither party argued nor proffered evidence that Andrews was a "soliciting agent" as defined in Miss. Code Ann. § 83-17-1. In order to establish an agency relationship between Petitioner or Insurisk and him, Andrews must have had actual or

---

[7] In its Order on Summary Judgment [103, 104], the Court previously found that a genuine issue of material fact existed, and the policy was ambiguous. At the trial to ascertain the parties' intent, the only testimony offered was First Specialty's witnesses. The Respondents did not offer any testimony. Although the Court now finds the policy is unambiguous, after evaluating extrinsic evidence, the Court holds that the intent of the parties evidences the same result.

[8] As aforementioned, the 2004 application indicated that USAL was an "owner." Additionally, USAL offered no testimony that it relied on the business description or the SIC code as being relevant to the scope of coverage.

apparent authority to act on behalf of First Specialty or Insurisk. Andrew Jackson Life Ins. Co. v. Williams, 566 So. 2d 1172, 1180 (Miss. 1990).

Andrews did not have actual authority to provide coverage. In the Brokerage Agreement between Bill Andrews Agency and Insurisk of August 27, 2003, section (5) states,

> BROKER is not the agent of and has no authority to bind INSURISK or any of its principals. BROKER shall not issue binders. If binders are issued by BROKER, the binders shall be of no effect even if copies of the binders so issued by BROKER are furnished to INSURISK.

Based on this agreement, Andrews did not have the actual authority to be an agent of the Insurisk, and there is no evidence that he had actual authority to be an agent for First Specialty.

"Apparent authority exists when a reasonably prudent person, having knowledge of the nature and usages of the business involved, would be justified in supposing, based on the character of the duties entrusted to the agent, that the agent has the power he is assumed to have." Williams, 566 So. 2d at 1180. The party asserting apparent authority has to burden to prove: (1) acts or conduct on the part of the principal indicating the agent's authority, (2) reasonable reliance on those acts, and (3) a detrimental change in position as a result of such reliance. Hutton v. Amer. Gen. Life & Accident Ins. Co., 909 So. 2d 87, 94 (Miss. Ct. App. 2005). Respondents have failed to prove the above elements.

Andrews clearly represented to USAL that he was not an agent for First Specialty or Insurisk. In a letter to Austin Jones of USAL dated April 24, 2003, Andrews stated,

> I spoke with Anne Turner today and she advised the wording had been changed in the Indemnification Agreement to make the wording more acceptable to **the insurance company**. . . This General Liability policy will be written using **the insurance company's** forms which will include any special exclusions. . . My past experience **with insurance companies** is <u>they</u> will not put themselves in the position of interpreting whether or not **their** insurance policy complies with the requirements of a particular contractual agreement. (emphasis added).

In Andrews' activity log, he noted,

Anne called and advised **they** had revamped the language to read 'for the insurable risk among those risks for which USAL has agreed to indemnify MSU.'. . . I am writing a GL policy which is normally written for office exposures. And while **the company** is using the Insurance Service Office form, **the insurance company** has its own particular exclusions and conditions. (emphasis added).

Also, when asked if he ever told USAL he was an agent for First Specialty, Andrews' uncontroverted testimony was that he had not.

As evidenced above, Andrews did not hold himself out to be an agent of First Specialty or Insurisk. Andrews referred to the First Specialty and Insurisk as "they" or "the insurance company." Also, Andrews never used First Specialty or Insurisk's letterheads or forms in any of his correspondence with USAL. He used his own letterhead. Further, Andrews testified he did not have any First Specialty forms in his office.

Respondents have not proffered any act or conduct on the part of the First Specialty or Insurisk indicating Andrews' authority and certainly not proved the requisite factors for apparent authority. In fact, the testimony is uncontroverted that neither Insurisk nor First Specialty ever had any contact with USAL. Accordingly, Andrews was not an agent for Insurisk or First Specialty.

Instead, Andrews was an agent for USAL. He assisted USAL in completing the applications and was USAL's agent to procure insurance. Furthermore, Andrews negotiated the policy for USAL. See Estate of Jackson v. Miss. Life Ins. Co., 755 So. 2d 15, 20-21 (Miss. Ct. App. 1999) (dealer's manager for insurance and finance was borrower's agent for the purpose of procuring insurance); First United Bank of Poplarville v. Reid, 612 So. 2d 1131, 1137 (Miss. 1992) ("It is undisputed, however, that the Reids were offered and accepted credit life insurance with respect to their loan and each extension thereof. Under the circumstances, the bank indeed

became their agent for the procurement of such insurance."). Given the above circumstances, the Court concludes Andrews was an agent for USAL, not for First Specialty or Insurisk.

## CONCLUSION

While the Court understands the policy is not perfect, the Court was able to ascertain the intent of the parties. Since the words of the insurance policy are plain and unambiguous, the court afforded them their plain, ordinary meaning and will apply them as written. Thus, the minor imperfections do not create coverage.

The Court finds that both the 2003 and 2004 policies are premises-only policies. Thus, the addition of the designated premises endorsement in the 2004 policy (the policy in effect at the time of the underlying action) did not restrict or reduce coverage. Also, even if the designated premises endorsement was a reduction in coverage, the endorsement was supported with notice and consideration. Either way, with or without the designated premises endorsement, both policies unambiguously contain premises-only coverage. Having heard testimony and reviewed the exhibits, the Court would come to the same conclusion because both the application submitted by Andrews and his receipt of the quote from Insurisk plainly state "premises-only." Lastly, Andrews was not an agent of First Specialty or Insurisk; conversely, he was an agent for USAL. In sum, First Specialty has no duty to defend or indemnify USAL or MSU in the underlying action.

So **ORDERED**, this the 10th day of December, 2008.

**/s/ Sharion Aycock**
**U.S. DISTRICT COURT JUDGE**